## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 22 2016, 8:29 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark S. Lenyo
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Community Park Investments, Inc., *Appellant*, <br><br> v. <br><br> Jennifer Mahoney and Curtis Glancy, *Appellees*. | December 22, 2016 <br><br> Court of Appeals Case No. 46A05-1601-PL-160 <br><br> Appeal from the LaPorte Superior Court <br><br> The Honorable Greta S. Friedman, Judge <br><br> Trial Court Cause No. 46D04-1509-PL-1604 |

**Brown, Judge.**

[1] Community Park Investments, Inc., ("CPI") appeals the judgment of the trial court on its complaint for damages. It raises several issues which we revise and restate as whether the evidence is sufficient to support a finding of constructive eviction. We affirm and remand.

### Facts and Procedural History

[2] Jennifer Mahoney and Curtis Glancy executed three documents in connection with their purchase of a mobile home and rental of a home site in LaPorte, Indiana, specifically, a Mobile Home Sales Contract, a Promissory Note & Personal Guarantee, and a Standard Lease/Rental Agreement.

[3] Pursuant to the Mobile Home Sales Contract, dated March 1, 2015, Mahoney and Glancy agreed to purchase a 1995 two-bedroom mobile home for $17,000. The contract was made on a pre-printed form and by completing the blank fields on the form and indicated Mahoney and Glancy made a down payment of $1,000. Additionally, in handwritten provisions, the contract stated "sold 'as is' no warranty or anything implied," "existing kitchen gas stove and electric fridge 'as is' condition," "seller agrees to install new bath and shower or shower only within 90 days," "buyers will only receive clear title upon pym't in full," and "buyers responsible for taxes on above effective March 1st, 2015." Plaintiff's Exhibit 3.

[4] Pursuant to the Promissory Note & Personal Guarantee, signed on February 7, 2015, Mahoney and Glancy promised "to pay the owner/lender [CPI] the principle sum of ($16,000.00) in lawful money from the 1st day of March,

2015," agreed "to pay interest at the rate of ten (10%) percent to be calculated monthly starting on the 1st day of April 2015," and agreed "to pay this Promissory Note in full upon demand; and agree[d] to make monthly payments towards this Note in the amount of . . . ($250.00), until such time as demand for payment in full is made by lender by certified mail to [Mahoney and Glancy], starting on or before the 1st day of March 2015."[1] Plaintiff's Exhibit 2.

Pursuant to the Standard Lease/Rental Agreement, signed on February 7, 2015, Mahoney and Glancy leased Lot #30, were "to have and to hold the same from the 1st day of March, 2015, and each month thereafter . . . until termination of this Lease hereinafter provided," and agreed to pay CPI "upon the execution of this Lease and on or before the 1st day of each succeeding month, without demand or notice, the sum of $550.00." Plaintiff's Exhibit 1. A handwritten statement in the margin of the first page of the lease stated "see sales agreement and promissory note attached." *Id.* Section III, titled Termination of Lease, provided that Mahoney and Glancy may terminate the lease by giving CPI thirty days written notice prior to the time of their departure, that CPI may terminate the lease by giving thirty days written notice, and that CPI may terminate the lease if Mahoney or Glancy "breaches this Lease or Commits an Event of Default as defined by Section V of this Lease." *Id.* at 2. Language later in Section III provided "[t]his Lease may be terminated

---

[1] When Jacob Pasternac, the owner of CPI, was asked whether the promissory note consisted of a promise to pay $16,000 before March 1, 2015, he testified "that was a mistake it should be 2016." Transcript at 7.

by [CPI] for the following reasons: [] Nonpayment of rent." *Id.* at 3. Section V, titled Events of Default, provided that an "event of default shall be defined as follows for the purpose of this lease: [] The failure to pay any installment of rent when the same becomes due and the failure continues for thirty (30) days." *Id.* at 4. Following the signature of Mahoney and Glancy on the last page of the lease document, the lease stated "April 1, 2015" on a line for "Date Lease is to Begin." *Id.* at 8.

[6] On June 23, 2015, CPI filed a Notice of Eviction against Mahoney and Glancy on the small claims docket of the LaPorte Superior Court requesting a judgment for $1,050 and which alleged in part "[l]ate payment of rent and arrears in rent." Appellant's Appendix at 26. On July 6, 2015, Mahoney and Glancy filed a Notice of Counter-Claim against CPI seeking "my down payment on home and rent" and requesting a judgment for $6,000. *Id.* at 22.

[7] On July 20, 2015, the court issued an Order of Eviction which stated that CPI appeared by counsel and Mahoney and Glancy appeared *pro se*, that evidence was heard,[2] and that CPI was entitled to possession of the premises, ordered Mahoney and Glancy to remove themselves from the premises of Lot 30 on or before July 29, 2015, and scheduled a damages hearing. In September 2015, CPI filed a petition to transfer the matter from the small claims docket to the superior court's plenary docket, and the court granted the petition.

---

[2] A transcript of this hearing is not included in the record.

[8] On November 9, 2015, the court held a damages hearing at which CPI appeared by counsel and Mahoney and Glancy appeared *pro se*. CPI presented the lease agreement, mobile home purchase contract, and promissory note. Jacob Pasternac testified he was the owner of CPI and, with respect to the monthly lease payment of $550, that $300 of that amount was attributable to lot rent and the remaining $250 was attributable to interest on the promissory note. Pasternac testified that he received a payment of $250 on the promissory note for March 2015, that he did not receive any additional payments on the promissory note, and that he did not receive a $300 lot rental payment until the eviction. He testified: "I received a lot of promises and because he got laid off he kept saying I got a – I'll get another job and work and try to find work and many times he said he would pay but he didn't pay anything except for that $250.00." Transcript at 9. Pasternac indicated that he was asking for $20,186, which consisted of lot rent of $300 per month for March through July totaling $1,500, interest payments of $250 per month for April through July totaling $1,000, late payments of $90 per month for five months under the lease totaling $450, court costs of $131 and $70, sheriff service fees of $35, the amount due under the promissory note of $16,000, and $1,000 to pay for attorney fees.

[9] Mahoney stated that she gave $1,500 to Pasternac on February 7, 2015, and $400 the following week for a total payment of $1,900 and that Pasternac had filled out the agreement. Mahoney then asked Pasternac if she had told him that the amount in the agreement was supposed to be $1,900 and whether he had said "oh, can we keep a thousand of it quite [sic] and I'll help you out with

furniture," and Pasternac responded that he received $1,000. *Id.* at 12. Mahoney further stated that Pasternac had told her "well we usually take $2,000.00 but since I'm not going to finance you I'm just going to let you buy a trailer . . . ." *Id.* at 13. Mahoney and Glancy stated that they paid for all of March, all of April, and $300 in May.

[10] Glancy stated that, once Pasternac found out he did maintenance to a trailer park, "he had me doing all kinds of things," that "when we first got it I had to clean the whole thing out he was using it as a storage shed," that Pasternac "said I will pay you to help me move all this stuff out of here" but he "never seen a dime of that," that Pasternac promised to fix a bathroom within three months, and that he "kept asking him and he refused to do it so I refused to pay him the lot rent or the rest of rent whatever." *Id.* at 14-15. Glancy further stated that Pasternac never provided receipts and that he and Mahoney had to send "money orders for [their] rent just to have a receipt because otherwise [they] wouldn't have got a receipt." *Id.* at 15-16. Glancy indicated he was laid off in May, that in May he gave Pasternac $300, and that "we worked plenty of things out that he was suppose to pay my [sic] for," that he "did four sewer jobs for him at no charge never once got paid for that," that "he promised to pay it, knock it off my rent and he never did or he never even talked about it," that "he kept charging me late payments that after this, there was no late payment before that because we weren't late until after that," and that "he tried saying that I was late and I had an argument with that I kept doing work and I wasn't late,

so the charges kept coming, and kept coming, and we refused to pay after May." *Id.* at 16-17.

[11] Mahoney stated "there's the money order of the rent that [Pasternac] said we did not pay him," "[t]here's some receipts that he refused to sign of the down payment on our trailer that we wrote out ourself, he refused to sign it," and "[w]e gave him cash in March when we moved, which our lease wasn't suppose to starts [sic] until April lst." *Id.* at 18. Mahoney testified that there was no thermostat and the back of the stove was leaking gas, that a person from NIPSCO told her that everybody has problems with Pasternac, and that Pasternac overheard it, yelled at the person, and went to NIPSCO to try to have the person fired.

[12] Mahoney and Glancy presented an unsigned receipt for $1,900 dated February 7th which stated "Down payment on trailer" and an unsigned receipt for $500 dated March 6th which indicated "March 6th to April 1st." Defendants' Exhibit A. They also presented numerous photographs showing the condition of the inside and outside of the trailer. Mahoney and Glancy testified as to the extensive issues with the trailer and the repairs they made to it. Glancy said he wanted to be out of the contract and have his $2,000 returned. On cross-examination, when asked if they looked at the mobile home prior to purchasing it, Mahoney and Glancy testified it was so packed they could not walk through it and that they just visually looked at it from the front door.

[13] On December 22, 2015, the court issued an order in which it found that Mahoney and Glancy paid $1,900 to CPI on February 7, 2015, and another $500 on March 1, 2015, and that CPI refused to give receipts of any kind for any payments. It found that Mahoney and Glancy moved into the mobile home on March 6, 2015, vacated the home in July, and did not pay for May, June, and July. It also found that "the testimony showed that when [CPI] showed the property to [Mahoney and Glancy] it was completely filled with [CPI's] property," that Mahoney and Glancy "testified that although they made a down payment of $1900.00 on the mobile home the 7th day of February, 2015, . . . they could not move in until the 6th day of March, 2015 because it took that long to clean out the mobile home," that "[m]ost of this was done by" Mahoney and Glancy, and that Pasternac "told [Mahoney and Glancy] he would pay them for the work but he did not do so." Appellant's Appendix at 2. The court further found that between February 7, 2015, and May 24, 2015, Mahoney and Glancy "paid a minimum of $3790.00" based on their receipts and "[a]n additional $420.00 may also have been paid based on the receipts but they were unclear as to whether these actual receipts are for payment on February 11, 12, 14, 15, and March 19, 2015." *Id.*

[14] The court noted that upon moving in, Mahoney and Glancy took pictures which showed a bathroom floor with half of the floor missing, a bathroom sink that was clogged and had standing water in it, electrical wires under a sink next to a rotted wall with a socket falling out of a hole in the wall with exposed insulation, and detached steps to the home sitting in a yard. They also took

pictures showing a front door that would not close and was tethered with a computer adapter wire, empty electrical sockets, no electrical boxes in outlets, moldy insulation and grass protruding from an interior wall into a room, mold on a wall, rust and water damage to kitchen linoleum floor, a completely clogged and unflushed toilet, and a mushroom type fungi growing out of the carpet in the living room. *Id.* at 3.

[15] The court also noted that Mahoney and Glancy "moved in with the understanding that [CPI] would install a shower or shower and tub in the bathroom within 90 days" and "believed they would be paid for work they did in the park including his home" and that "[n]either of these things occurred." *Id.* It observed that, when Glancy lost his job in May, he did not make rent payments for June and July, that the eviction proceeding was initiated on June 23, 2015, and that Mahoney and Glancy filed a counterclaim on July 6, 2015, and vacated the premises. The court stated in part that "the concept of constructive eviction requires the living conditions to be so egregious as to impact the livability of the home," that it "further envisions a landlord being made aware of the condition and being given an opportunity to respond and correct the problem," and that "[f]inally, the tenant must vacate within a reasonable period of time once it becomes apparent to a reasonable person that the landlord won't take corrective action . . . ." *Id.*

[16] The court then found, "based on the evidence, testimony and facts presented that a constructive eviction occurred," that CPI's "claim for $20,186.00 is unfounded and was not proven by a preponderance of the evidence," and it

therefore denied the claim. *Id.* The court also found that Mahoney and Glancy "had minimal use of the property during the months of March, through June 2015," that "[t]he $1900.00 deposit which was paid on the 7th day of February, 2015, is however to be returned" to them, and that it "finds for [Mahoney and Glancy] on their counter-claim and awards $1900.00 to them to be paid by [CPI]." *Id.* at 4.

## *Discussion*

[17] The issue is whether there is sufficient evidence to support the trial court's finding of constructive eviction. We note that Mahoney and Glancy have not filed an appellees' brief. When an appellee has not filed an answer brief, we need not undertake the burden of developing an argument on the appellee's behalf. *Henderson v. Henderson*, 919 N.E.2d 1207, 1210 (Ind. Ct. App. 2010). Rather, we may reverse the trial court if the appellant presents a case of *prima facie* error. *Id.*

[18] When reviewing a challenge to the sufficiency of the evidence, we will not weigh the evidence nor judge the credibility of witnesses. *Sigsbee v. Swathwood*, 419 N.E.2d 789, 793 (Ind. Ct. App. 1981). When a trial court has made findings of fact, we apply the following two-tier standard of review: whether the evidence supports the findings of fact, and whether the findings support the conclusions thereon. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). Findings will be set aside if they are clearly erroneous. *Id.* Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. *Id.* A judgment is clearly erroneous if it applies the

wrong legal standard to properly found facts. *Id.* In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made. *Id.*

[19] CPI maintains that, to successfully assert the defense of constructive eviction, a lessee must quit the premises and that Mahoney and Glancy stayed at the mobile home as long as they could and did not move until the court entered an order of eviction. CPI also argues the court erred in assessing damages and that the court's judgment against it of $1,900 would essentially mean that Mahoney and Glancy were able to live in the mobile home for five months for free and receive a refund of the amount they claimed to be their down payment.

[20] Constructive eviction is a breach by a lessor "so direct and positive, and so substantial and permanent in character as to operate as a material and effectual exclusion of the tenant from the beneficial enjoyment of some part of the leased premises." *Sigsbee*, 419 N.E.2d at 793 (quoting *Talbott v. English*, 156 Ind. 299, 59 N.E. 857, 860 (1901)). *See also Village Commons, LLC v. Marion Cty. Prosecutor's Office*, 882 N.E.2d 210, 217 (Ind. Ct. App. 2008) ("[C]onstructive eviction occurs when an interference with possession [is] so serious that it deprives the lessee of the beneficial enjoyment of the leased premises."), *reh'g denied, trans. denied*. When this occurs, the tenant has a "right of election to quit, and avoid the lease and rent, or abide the wrong, and seek his remedy in an action for the trespass." *Talbott*, 59 N.E. at 860. In addition, "[i]mposed upon the lessee is the further limitation that the abandonment must occur

within a reasonable time after the lessor has committed the act or omission considered to be the constructive eviction." *Sigsbee*, 419 N.E.2d at 794 (citations omitted). "Within a reasonable time means within a reasonable time under the circumstances of the case. That is, certain circumstances extend the time deemed to be reasonable." *Sigsbee*, 419 N.E.2d at 794 (citing *American National Bank & Trust Co. v. Sound City, U. S. A., Inc.*, 385 N.E.2d 144 (Ill. App. Ct. 1979) (delay of three months excused for reliance upon lessor's promise to repair)). "Generally, whether the abandonment was made within a reasonable time is a question of fact for the trier thereof." *Id.* "In summary: If an act or omission by the lessor materially deprives the lessee of the beneficial use or enjoyment of the leased property, the lessee may elect to abandon the property and avoid further obligations under the lease." *Id.* "If the lessee so elects, the abandonment of the property must occur within a reasonable time after the act or omission." *Id.*

[21] In this case, the trial court found, "based on the evidence, testimony and facts presented," Appellant's Appendix at 3, that the condition of the mobile home when Mahoney and Glancy moved in and CPI's acts or omissions after they took possession constituted constructive eviction. The trial court's findings are based on its assessment of the evidence and the credibility of Pasternac as the owner of CPI, Mahoney, and Glancy, all of whom testified before the trial court. We will not weigh the evidence or judge the credibility of witnesses. *See Sigsbee*, 419 N.E.2d at 793. The court found that Mahoney and Glancy could not actually see the conditions of the home when they agreed to the purchase

due to CPI's belongings cluttering the entire interior, that upon moving in Mahoney and Glancy took photographs depicting the condition of the home, that Glancy lost his job in May, that CPI agreed to install a new bath and shower or shower in the bathroom within ninety days and the installation never occurred, and that CPI told Mahoney and Glancy they would be paid for any work in the park but did not in fact ever pay them. We defer to the trial court's factual determination that four months was a reasonable amount of time to remain in the premises under these circumstances.

[22] Given these facts, we are not firmly convinced that a mistake has been made. We cannot say that the trial court's finding of constructive eviction is clearly erroneous. *See Village Commons*, 882 N.E.2d at 218 (observing that substantial evidence supported the trial court's findings that water intrusions were recurring, the evidence supported the court's findings that the tenant was deprived of a material part of the leased premises, and that the landlord was essentially asking this court to reweigh evidence, and holding we were not firmly convinced that a mistake had been made and thus could not say the court's findings were clearly erroneous).

[23] While we do not disturb the trial court's finding of constructive eviction, we nevertheless observe that Mahoney and Glancy may not avoid their financial obligations to CPI for the period of time they were in possession of the mobile home. *See T & W Bldg. Co. v. Merrillville Sport & Fitness, Inc.*, 529 N.E.2d 865, 871 (Ind. Ct. App. 1988) ("As long as the Tenant chose to endure those faults and occupy the premises, it was liable for the rent."), *reh'g denied*, *trans. denied*.

The court found that Mahoney and Glancy moved into the mobile home in March 2015 and vacated it in July. We remand to the trial court for reconsideration of the damages to be awarded Mahoney and Glancy, balancing the amounts they paid in deposit and rent with the time period they resided in the mobile home.

## *Conclusion*

[24] For the foregoing reasons, we affirm the trial court's finding of constructive eviction and remand for reconsideration of damages consistent with this opinion.

[25] Affirmed and remanded.

Robb, J., and Mathias, J., concur.