**TODD HELLER, INC., Appellant–Plaintiff,**

v.

**INDIANA DEPARTMENT OF TRANSPORTATION, Appellee–Defendant.**

No. 49A04–0402–CV–83.

Court of Appeals of Indiana.

Dec. 16, 2004.

Rehearing Denied Feb. 16, 2005.

J. Chris Reininga, Landman & Beatty, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Frances Barrow, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

RILEY, Judge.

*STATEMENT OF THE CASE*

Appellant–Plaintiff, Todd Heller, Inc. (Heller Inc.), appeals a negative judgment in its breach of contract suit against Appellee–Defendant, Indiana Department of Transportation (INDOT).

We reverse and remand.

*ISSUES*

Heller Inc. raises three issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the trial court erred by finding that there is no usage of trade in the glass bead industry that supplemented the contract between Heller Inc. and INDOT; and

(2) Whether the trial court's judgment in favor of INDOT was clearly erroneous.

*FACTS AND PROCEDURAL HISTORY*

In February of 2001, INDOT executed a Quantity Purchase Award agreement (the QPA) with Heller Inc., according to which Heller Inc. was to manufacture, package, and deliver glass beads to INDOT districts throughout Indiana from March 1, 2001, to February 28, 2002. Glass beads are tiny spheres, approximately the size of table sugar, which are mixed into traffic paint to create a reflective property. Heller Inc., a Pennsylvania corporation, has been in the glass bead industry for approximately eight years.

INDOT's invitation to bid for the QPA and the QPA itself both state:

All bidders are required to be familiar with the methods of sampling, testing and reporting that are used by [INDOT]. This may be accomplished by contacting the Materials and Test Divi-

sion. Such procedures will be binding upon the successful bidder throughout the contract period.

(Pl. Exhibits 1, 3; Appellant's App. p. 25). Pursuant to the specifications set forth in both the invitation to bid and the QPA, the glass beads were to "have moisture resistant and adhesion coating(s)" and "be in accordance with AASHTO M 247...." (Pl. Exhibits 1, 3; Appellant's App. p. 22).

AASHTO is an acronym for the American Association of State Highway Transportation Officials. AASHTO M 247 refers to a national standard specification for glass beads used in traffic paints. Both parties agree that the then-current AASHTO M 247 specification, to which INDOT's invitation to bid and the QPA were understood to refer, was M 247–81 (2000). (Pl. Exhibit 2). Section 4.4.2 of the Methods of Sampling and Testing portion of M 247–81 describes the procedure for testing the moisture resistance of glass beads (the AASHTO moisture resistance test) as follows:

> A 100 g sample of beads is placed in a 600 mL beaker and *an equivalent volume of distilled water shall be added to the beaker*. The beaker will then stand for 5 minutes, at the end of which time the water shall be carefully poured off and the beads transferred to a clean dry beaker and allowed to stand for 5 minutes. The beads will then be poured slowly into a standard glass funnel.... The beads shall flow through the funnel stem without stoppage. Slight initial agitation to start the flow through the funnel at the beginning of the test is permissible.

(Pl. Exhibit 2) (emphasis added). The purpose of the AASHTO moisture resistance test is to ensure that the beads will not absorb moisture in storage, will remain free of clusters and lumps, and will flow freely from the dispensing equipment. (Pl. Exhibit 2).

In March of 2001, Heller Inc. began delivering glass beads to INDOT. Throughout the manufacturing process and prior to delivery, Heller Inc. would subject the glass beads to the AASHTO moisture resistance test. Although some of the beads would stick to the beakers, all of Heller Inc.'s glass beads passed the AASHTO moisture resistance test as performed by Heller Inc. before being sent to INDOT.

Heller Inc. conducted the AASHTO moisture resistance test according to what Todd Heller (Heller) calls the "customary practice in the industry." (Transcript p. 50). Specifically, Heller Inc. would tilt the beaker at an angle and slowly pour water down the side of the beaker, "just as if you'd be trying to pour a beer without putting a head on it." (Tr. p. 51). The plant manager of Heller Inc.'s glass beads plant, Mike Muta (Muta), learned "how people in the industry introduced the water in the beaker" when he received AASHTO moisture resistance test training at a previous job. (Tr. p. 157).

During the time period from approximately March 15, 2001, to April 24, 2001, INDOT rejected several batches of Heller Inc.'s glass beads for moisture resistance failure. Pursuant to the QPA, Heller Inc. was required to dispatch a truck to retrieve the rejected batches. Upon the rejected beads' return, Heller Inc. would subject the beads to the AASHTO moisture resistance test; the rejected beads passed the AASHTO moisture resistance test as it was performed in Heller Inc.'s laboratory.

On April 24, 2001, Heller Inc. came to INDOT to discuss the moisture resistance failures. In INDOT's laboratory, INDOT's senior chemist, Todd Tracy (Tracy), performed the AASHTO moisture resis-

tance test on a sample of Heller Inc.'s glass beads that had failed when tested previously by INDOT. Instead of tilting the beaker and slowly introducing water, Tracy "just dumped" water into the beaker such that "the weight of the water burrowed a hole through the beads so water got underneath the sample...." (Tr. pp. 69–70). As Tracy began to pour the water off the beads, Heller objected because he observed that "water was still trapped underneath the sample." (Tr. p. 71). "Pockets of water trapped in the product ... can cause ... a clump in the product and cause a failure in the ... funnel." (Tr. p. 71). According to Heller, Tracy then took the time to carefully pour off the water from the beads, and the sample passed the moisture resistance test.

Next, Heller demonstrated for INDOT how Heller Inc. performs the AASHTO moisture resistance test by performing the test on samples of glass beads, both coated and uncoated, which Heller Inc. had brought to INDOT. In particular, Heller emphasized the practice of gently and carefully introducing water into the tilted beaker. Heller Inc. then requested that INDOT modify the way it performed the AASHTO moisture resistance test in order to perform it "the way the test should be done." (Tr. p. 75). To further illustrate the point, Heller Inc. subsequently produced a videotape of four variations on the AASHTO moisture resistance test. The first variation on the videotape was a demonstration of the proper method, according to Heller, while the last three variations incorporated the allegedly faulty testing methods employed by INDOT. Of the four variations depicted in the videotape, the glass beads passed only the first one.

At the April 24, 2001 meeting, Gary Bowser (Bowser), INDOT's operations field engineer, told Heller he would like the traffic lines in which the glass beads were used to be brighter and wondered whether there was something Heller could do to "have more beads floating on top of the paint." (Tr. p. 75). In response to this request, Heller added flotation coating to the beads in order to increase the beads' "retro reflectivity." (Tr. p. 76). In the Scope section of the AASHTO M 247–81, Note 1 reads, "Since the flotation coating imparts moisture resistance to the beads the moisture resistance test may be waived by the purchaser if the beads are ordered with the flotation property." (Pl. Exhibit 2). After adding flotation coating and another moisture resistance coating to the beads, Heller Inc. shipped the beads to INDOT. Every batch failed the AASHTO moisture resistance test as performed by INDOT.

Heller contacted Bowser, expressing concern over the repeated moisture resistance failures and asking to speak to someone at INDOT with authority. Bowser directed Heller to speak with Firooz Zandi (Zandi), Tracy's supervisor. After Heller informed Zandi that INDOT was performing the AASHTO moisture resistance test improperly, Zandi sent the six rejected batches of beads back to Heller Inc. so the company could have them tested at an independent laboratory. Heller took the beads to the Pennsylvania Department of Transportation (Penn DOT) for independent testing and videotaped the lab's performance of the AASHTO moisture resistance testing of Heller Inc.'s beads. The video reveals that when Penn DOT tested the beads INDOT had rejected, a thin layer of beads was left sticking to the side of the beaker after the water was poured off. Penn DOT concluded that all six batches of Heller Inc. beads passed the AASHTO moisture resistance test. Heller sent a copy of this videotape to INDOT.

By letter dated May 25, 2001, INDOT cancelled the QPA agreement with Heller

Inc. due to the repeated failure of Heller Inc.'s beads to pass the AASHTO moisture resistance test. (Pl. Exhibit 13). Before canceling the contract, however, Bowser called Penn DOT to inquire as to their method of performing the AASHTO moisture resistance test. Penn DOT's description of their method of performing the test was consistent with or similar to what Heller had described at the April 24, 2001, meeting.

After INDOT cancelled the contract with Heller Inc., Bowser telephoned the Departments of Transportation in five states other than Pennsylvania as part of a small survey to determine the other states' methods of performing the AASHTO moisture resistance test. Of the five states included in Bowser's survey, three of the states do not perform moisture resistance tests, one performs a "simple spoon test," and one of the states said that when performing the AASHTO moisture resistance test, they gently pour the water into the beaker (as Penn DOT does in the video produced by Heller Inc.) (Tr. p. 172). After performing this survey, Bowser sent an e-mail message to INDOT personnel that read, in pertinent part, as follows:

I called Minn, TN, Mich, NH, and IL. Only IL does the beaker test and they slowly poor [sic] the water in on the beads. We want to go this way in the new QPA. We even asked legal if making a change now would cause a problem with the current negotiations w/ Todd Heller and they gave us the ok.

(Pl. Exhibit 20).

On December 3, 2001, INDOT released another invitation to bid. (Pl. Exhibit 21). In this invitation to bid, the Specifications section of Appendix B includes the following language:

Glass beads supplied under this contract shall have moisture resistant and adhesion coating(s) and shall be in accordance with AASHTO M 247.... When testing for moisture, the water shall be slowly and carefully added to the side of the beaker, tilted at approximately a 30–degree angle, to not disturb the beads. (Pl. Exhibit 21).

On January 28, 2002, Heller Inc. filed a complaint against INDOT for breach of contract. On February 6, 2002, Heller Inc. filed a First Amended Complaint. On or about February 18, 2002, INDOT filed an answer. On October 14, 2003, the trial court conducted a bench trial at which INDOT requested the trial court to enter special findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A). On January 12, 2004, the trial court entered findings of fact, conclusions of law, and judgment for INDOT. These read in pertinent part:

### FINDINGS OF FACT

. . . .

12. The AASHTO standard is silent as to how water is to be added to the beaker.

13. Some states perform the AASHTO moisture resistance test for glass beads by tilting the beaker at an angle and slowly adding water to the side of the beaker so as not to disturb the glass beads.

14. INDOT performs the AASHTO glass bead moisture test by pouring the water straight into the beaker without tilting.

. . . .

18. On May 11, 2001, Heller [Inc.] submitted a video of its own moisture resistance tests to INDOT.

. . . .

20. Heller [Inc]'s own tests on its own product in the video fail to comply with the AASHTO standard. In each test, all of the test material was not emptied into the second

beaker after the five-minute containment in the first beaker. Bead material coated the side of the original beaker after its contents were poured into the second beaker. Coating also occurred when the beads were poured out of the second beaker into the funnel. All of the beads were not poured out of the second beaker. Heller [Inc.]'s test personnel also held the funnel in his hand, rather than placing it in a ring stand, concealing the neck of the funnel and shook the funnel after the beads became lodged in its neck.

21. On May 25, 2001, INDOT informed Heller [Inc.] that twelve of sixteen glass bead batches submitted for testing failed moisture resistance tests, that six double samples also failed, and that the QPA was canceled under paragraph 18 of the contract for repeated failures.

22. Heller [Inc.] then submitted its glass beads for further testing to [Penn DOT] .... as videotaped by Heller, and Penn DOT personnel indicate on video that the samples pass. ( [Pl.] Exhibit 25).

23. The Penn DOT test on the video did not even comply with the AASHTO method. The Penn DOT method states: "A thin, even layer of beads may coat the inside of the original beaker." (Pl. Exhibit 12)[.]

....

25. Todd Tracy, a chemist in the INDOT's Materials and Testing Laboratory, demonstrated its moisture resistance test procedure in open court during the trial. In the demonstration, there was no thin layer of beads when the water was poured off from beaker 1 to beaker 2; all of the glass beads flowed out of the beaker. After allowing the beads to rest for 5 minutes in beaker 2, its contents were poured through the designated type funnel. "Less than a gram," or virtually no glass beads, remained in the containers or funnel at any point in the test performance. These results were in stark contrast to the results of the tests performed by the contractor or Penn DOT; in those tests, large amounts of congealed glass beads were allowed to remain in the beakers and never sent through the funnel at the final stage of the test.

26. Heller submitted a claim for payment of the glass beads used by the Vincennes and Greenfield Districts ($10,080.00 and $11,660, respectively) and for the cost of pallets ($11,736.90) that were specially made for this contract. That claim, including other charges such as shipping, amounted to $98,065.14.

27. INDOT was not required to pay for any product, whether used or not, that fails to meet specifications (Exhibit 3, Contract Appendix B, par. 18.1.)

28. The QPA also permits INDOT to specify that the special pallets would be returned to the contractor for re-use only if requested. (Exhibit 3, Contract Appendix B, par. 16.12.) Heller never made such a request.

CONCLUSIONS OF LAW

....

7. There is no custom in the bead industry of performing AASHTO moisture resistance tests by tilting the beaker and slowly and carefully pouring the water down the side of the beaker so as not to disturb the beads.

8. Clear and ambiguous contracts do not require interpretation and it is the duty of the courts to enforce them. *Centennial Mortgage, Inc. v. Blumenfield* [*Blumenfeld*] [745 N.E.2d 268, 273 (Ind.Ct.App.2001)].

9. The contract does not require IN-DOT to adopt Penn DOT's method of moisture resistance testing under the AASHTO standard for glass beads, nor allow changing the test method during the contract period.

. . . .

(Appellant's App. pp. 5–11).

Heller Inc. now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

At INDOT's request, the trial court entered findings of fact and conclusions of law. *See* Ind. Trial Rule 52(A). When the trial court has entered findings of fact and conclusions of law upon the request of a party, pursuant to Indiana Trial Rule 52, we apply the following two-tiered standard of review: whether the evidence supports the findings and whether the findings support the judgment. *Clark v. Crowe*, 778 N.E.2d 835, 839 (Ind.Ct.App.2002). The court's findings and conclusions will be set aside only if they are clearly erroneous, that is, if the record contains no facts or inferences supporting them. *Id.* at 839–40. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Id.* at 840. We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. *Id.*

We define the clearly erroneous standard based on whether the party is appealing a negative judgment or an adverse judgment. *Garling v. Ind. Dep't of Natural Res.*, 766 N.E.2d 409, 411 (Ind.Ct.App. 2002), *trans. denied.* Where, as here, the party who had the burden of proof at trial appeals, he appeals from a negative judgment and will prevail only if he establishes that the judgment is contrary to law. *Clark*, 778 N.E.2d at 840. A judgment is contrary to law when the evidence is without conflict and all reasonable inferences to be drawn from the evidence lead to only one conclusion, but the trial court reached a different conclusion. *Id.*

### II. *Usage of Trade*

■ Heller Inc. argues first that the trial court erred by concluding that there is no custom or usage of trade in the glass bead industry supplementing the QPA between Heller Inc. and INDOT. Specifically, Heller Inc. argues that its glass beads failed the AASHTO moisture resistance tests only because INDOT was not performing the test in accordance with this usage of trade. We agree.

Because the QPA was for the delivery of "goods," the QPA is governed by the Uniform Commercial Code. *See* Ind.Code § 26–1–2–105(1).[1] As such, the terms of the QPA may be explained or supplemented by usage of trade. I.C. § 26–1–2–202. "Usage of trade" is explained in Indiana Code § 26–1–1–205(2):

A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence

---

1. " 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale, other than the money in which the price is to be paid, investment securities (IC 26–1–8.1), and things in action." I.C. § 26–1–2–105(1).

and scope of such a usage are to be proved as facts.

Heller Inc. contends that there is a glass bead industry usage of trade with respect to the proper method of performing the AASHTO moisture resistance test. Heller Inc. describes this usage of trade's method and rationale as follows:

> When performing the AASHTO moisture resistance test, it is a customary practice in the glass bead industry to tilt the beaker at an angle and to slowly add the water to the side of the beaker so as not to disturb the glass beads. It is important to not disturb the beads when adding the water to the beaker because water can become trapped under the beads, making it difficult or impossible to later pour all the water off as required by the AASHTO moisture resistance test.

(Appellant's Br. p. 4; Tr. pp. 69–71, 138, 157).

INDOT argues and the trial court found that Heller Inc. failed to prove as a fact that the method it advocates as the proper way to perform the AASHTO moisture resistance test amounts to a usage of trade. INDOT argues further that because the AASHTO designation used in the Specifications section of the QPA was silent as to how exactly to perform the AASHTO moisture resistance test, INDOT had the discretion to decide whether to tilt the beaker, how to introduce the water into the beaker, and whether a thin coating of beads sticking to the inside of the beaker signals moisture resistance failure. Moreover, INDOT continues, the QPA specifies that Heller Inc. was required to be familiar with INDOT's testing methods. Finally, INDOT points to an in-court dem-

onstration of the AASHTO moisture resistance test performed by INDOT's Tracy in which virtually no glass beads remained in the containers or beaker.

Our review of the record reveals that following Tracy's in-court demonstration of the AASHTO moisture resistance test, Tracy admitted during cross examination that he did not know the specific coatings that were on the beads he had used to perform the AASHTO moisture resistance test demonstration. Heller testified that the beads would not stick to the beakers at all if the beads were covered only with moisture resistance coating and not with adhesion coating. This is so because different coatings on the beads can affect how the beads will behave when being tested for moisture resistance. It is undisputed that the glass beads Heller Inc. supplied under the QPA had moisture resistance, flotation, and adhesion coatings. Because there was no showing that the glass beads used by Tracy in the in-court demonstration had the same coatings as Heller Inc.'s beads, we conclude that the in-court demonstration has little or no probative evidentiary value.

The in-court demonstration, however, appears to be the only evidence the trial court relies upon in finding that bead coating left behind in the beakers signals moisture resistance failure. The AASHTO 247–81 designation itself is silent on this point. It states, "The beads shall flow through the funnel stem without stoppage" but says nothing about the implications of a thin layer of beads left behind in beakers.[2] (Appellant's Exhibit 2). Because we have already determined that the in-court demonstration had little or no evidentiary value, we conclude that there is no rele-

2. We note that the moisture resistance test for AASHTO M 247–02, the AASHTO standard that came into effect subsequent to the events at issue in this case, includes the following language in Methods of Sampling and Testing, 6.4.2: "A thin, even layer of beads may coat the inside of the original beaker." (Pl. Exhibit 35).

vant evidence of probative value to support the trial court's finding that the moisture resistance tests performed by Heller Inc. fail to comply with the AASHTO standard simply because bead material coated the sides of the beakers. Because we find that the evidence does not support the findings to this effect, we must set them aside. *See* T.R. 52(A).

■ The record also shows that INDOT offered no relevant evidence at trial to refute the uncontroverted evidence supporting the existence of a usage of trade in the glass beads industry. The uncontroverted evidence supporting the existence of a usage of trade includes, first, INDOT's survey of other states' Departments of Transportation, which revealed that the states performing the AASHTO moisture resistance test tilt the beaker and introduce the water slowly and gently, as it was done at Penn DOT. Second, INDOT's Bowser testified that this was the first year INDOT used the AASHTO moisture resistance test on glass beads and Tracy admitted that he never received training in the AASHTO moisture resistance test and does not know its purpose. Third, INDOT modified its QPA after the Heller Inc. debacle, explicitly clarifying the method to be used when performing the AASHTO moisture resistance test—the new method is consistent with the method that Heller Inc. was advocating.

Finally, there is the testimony of Heller, who has worked in the glass beads industry for eight years, and Muta, who has worked in the industry for eighteen years and received training in the AASHTO moisture resistance test at a previous job. Heller and Muta both testified that they are familiar with how people in the glass beads industry perform the AASHTO moisture resistance test and that there is a custom or usage of trade in the industry with respect to the method of introducing water into the beaker, in particular. The testimony of one individual has been found sufficient to establish a usage of trade. *See Parker v. Rod Johnson Farm Serv.*, 179 Ind.App. 190, 384 N.E.2d 1129, 1132 (1979) (finding buyer's testimony sufficient to establish a usage of trade where buyer testified that, in the grain industry, if no year of delivery is specified in the contract, it is understood that the year of delivery will be the same year as the contract). We therefore conclude that the uncontroverted relevant evidence and all reasonable inferences to be drawn therefrom point to the conclusion that there is a usage of trade in the glass beads industry that dictates how the AASHTO moisture resistance test is to be performed.[3] Accordingly, we find that the trial court clearly erred in finding that Heller Inc. failed to prove by a preponderance of the evidence the existence of a usage of trade. *See* T.R. 52(A).

### III. *Breach of Contract*

■ Next, we address Heller Inc.'s contention that the trial court erred in concluding that Heller Inc. breached the contract when, in fact, INDOT was the breaching party. The record shows that INDOT cancelled the contract with Heller

---

**3.** Given this conclusion, there can be no merit to INDOT's contention that it had the discretion to decide what method to employ when performing the AASHTO moisture resistance test and Heller Inc. had a duty to be familiar with that method. This contention is without merit because the existence of a usage of trade in the glass beads industry dictating how the test is to be performed trumps IN-DOT's "discretionary" interpretation of the test method. To be sure, this is precisely the point of a usage of trade, which is "any practice, or method of dealing having such regularity of observance in a . . . vocation or trade *as to justify an expectation that it will be observed with respect to the transaction in question.*" I.C. § 26–1–1–205(2) (emphasis added).

Inc. by letter on May 25, 2001, which states in relevant part:

As stated in Section 15.5 [of the QPA], INDOT reserves the right to test random field samples from delivered material for compliance. As a result of this testing, INDOT received twenty-eight (28) loads/batches to date, which sixteen (16) loads/batches consisted of twelve (12) failures. The samples repeatedly failed the moisture testing, which six (6) of these failures were double sampled and tested again with all six (6) failing this retest.

In accordance with paragraph 18.00— Repeated Penalties, "Glass beads delivered on a Quality Assurance basis which fail, after delivery, one or more certified tests repeatedly will not be acceptable. In such cases, INDOT will have the option to cancel the contract at any time."

(Pl. Exhibit 13). Thus, INDOT cancelled the contract due to repeated moisture resistance failure. But as we have already established, INDOT was not performing the AASHTO moisture resistance test in accordance with the usage of trade. As stated in the trial court's findings, INDOT was "pouring the water straight into the beaker without tilting." (Appellant's App. p. 7). In light of the evidence establishing that this method of introducing water increases the likelihood of failure because it causes the water to become trapped under the beads, we can reasonably infer that the repeated failures of Heller Inc.'s beads were a reflection of this flawed method of performing the test rather than an accurate indicator of the moisture resistance of the beads.

However, INDOT asserts and the trial court concluded that the QPA did not permit INDOT to change its testing methods during the contract period. We find that the evidence does not support this conclu-sion. INDOT cites paragraph 15.6 of Appendix B of the QPA, which states in pertinent part, "All bidders are required to be familiar with the methods of . . . testing . . . used by [INDOT]. . . . Such procedures will be binding upon the successful bidder throughout the contract period." (Pl. Exhibit 3). First, our reading of this clause does not support the conclusion that the QPA prohibited INDOT from changing its testing methods. Second, as discussed previously, Heller Inc. did not ask INDOT to "change" its testing methods; instead, Heller Inc. merely requested that INDOT perform the AASHTO moisture resistance test in accordance with the usage of trade.

Last, Heller Inc. refuted the assertion that INDOT was prohibited from changing test methods by proffering evidence demonstrating that INDOT had, in fact, changed their gradation testing method upon Heller Inc.'s advice. Specifically, Bowser testified that initially, INDOT's method of performing the gradation test was to take three individual samples, and if any individual sample failed, INDOT would fail the entire load. The record shows that in a phone conversation on or about April 26, 2001, Heller and Bowser discussed gradation-testing procedures. (Tr. p. 181). The next day, Bowser sent a letter to Heller stating in pertinent part: "INDOT will average the gradation of the 3 samples taken in random testing." (Pl. Exhibit 28). After INDOT changed its gradation test methods, there were no further gradation problems with Heller Inc.'s beads.

We conclude that the evidence is without conflict and all reasonable inferences to be drawn therefrom lead only to the conclusion that INDOT, rather than Heller Inc., breached the QPA. *See Clark,* 778 N.E.2d at 840. We therefore find that the trial court's judgment is clearly erroneous and contrary to law. *See id.* at 839–40. Ac-

cordingly, we reverse the judgment of the trial court and remand with instructions to enter judgment in favor of Heller Inc. for the amount of damages proved at trial.[4]

## CONCLUSION

Because the evidence is without conflict and all reasonable inferences to be drawn therefrom lead to the conclusion that there is a usage of trade in the glass bead industry with respect to the proper method of performing the AASHTO moisture resistance test, we find that the trial court clearly erred in concluding that there is no such usage of trade. We also conclude that the trial court's judgment that Heller Inc. is the breaching party is clearly erroneous and contrary to law. Accordingly, we reverse the judgment and remand with instructions to the trial court to award the damages Heller Inc. proved at trial.

Reversed and remanded.

CRONE, J., concurs.

VAIDIK, J., dissents with opinion.

VAIDIK, Judge, dissenting.

I respectfully disagree with the majority's conclusion that the trial court erred in finding in favor of INDOT. The majority's holding is premised on the fact that "there is a usage of trade in the glass beads industry that dictates how the AASHTO moisture resistance test is to be performed." Op. p. 148. Whether there exists a usage of trade regarding how AASHTO performs its moisture test, however, is not the determinative issue before this Court.

The majority correctly points out that the agreement is one for the sale of goods;

and thus, it is governed by Indiana's commercial code. Of particular relevance to this case is Indiana Code § 26-1-1-205(4), which states:

> The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.

*See also* Ind.Code § 26-1-2-208(2) ("The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (IC 26-1-1-205).").  The agreement at issue here expressly provided, "All bidders are required to be familiar with the methods of sampling, testing and reporting that are used by [INDOT]. This may be accomplished by contacting the Materials and Tests Division. Such procedures will be binding upon the successful bidder throughout the contract period."[5]  *Id.* at 25. Thus, the relevant inquiry is how INDOT sampled, tested, and reported for moisture resistance.

While the agreement also set forth that the "[g]lass beads supplied under this contract shall have moisture resistant and adhesion coating(s) and shall be in accordance with AASHTO M 247, Type 1[,]" *Id.* at 22, this is not to say that the AASHTO

---

4.  At trial, Heller Inc. proved the damages to which it is entitled pursuant to Indiana Code § 26-1-2-708.

5.  The agreement further provided, "Random field samples from delivered material will be taken periodically and tested for compliance. The results of field samples will prevail over all other tests." Appellant's App. p. 25.

methods of testing were to be employed. AASHTO M 247–81 designates the standard specifications for glass beads used in traffic paints, and to that end, AASHTO M 247–81 was incorporated into the agreement between the parties. While admittedly AASHTO M 247–81 also delineates methods of sampling and testing glass beads, the agreement between Todd Heller, Inc. and INDOT explicitly stated that "[a]ll bidders are required to be familiar with the methods of sampling, testing and reporting that are used by [INDOT]" and that "[s]uch procedures will be binding upon the successful bidder throughout the contract period." Appellant's App. p. 25. In light of this unequivocal statement that INDOT sampling, testing, and reporting methods were to be employed, I cannot say that usage of trade considerations regarding how AASHTO sampling and testing methods are performed, if such a usage of trade indeed exists,[6] would override the parties' written agreement. *See* Ind. Code § 26–1–1–205(4). Consequently, I would affirm the trial court's judgment in favor of INDOT.

**6.** We note that of the five states informally surveyed by the INDOT, only one of the states performed the AASHTO test as advocated by Todd Heller, Inc. Due to such scant evidence, I am not convinced that a usage of trade was established.