

# IN THE
# Court of Appeals of Indiana



FILED

Feb 28 2025, 11:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

Ira J. Gamble,

*Appellant-Plaintiff,*

v.

Tina McQueary,

*Appellee-Defendant.*

---

February 28, 2025

Court of Appeals Case No.
24A-PL-1500

Appeal from the
Elkhart Circuit Court

The Honorable
Michael A. Christofeno, Judge

Trial Court Cause No.
20C01-2002-PL-28

---

**Opinion by Senior Judge Najam**
Judges Weissmann and DeBoer concur.

**Najam, Senior Judge.**

## Statement of the Case

Ira J. Gamble appeals (1) the trial court's determination that Tina McQueary has an equitable ownership interest in a house that she was purchasing from Gamble under a rent-to-own lease agreement and (2) the court's calculation of the money judgment entered against McQueary. Gamble contends the trial court erred in its holdings. We conclude Gamble has failed to demonstrate error, and we affirm.

## Issues

Gamble raises the following issues, which we restate as:

> I. Whether the trial court erred in determining McQueary had an equitable ownership interest in the house; and
>
> II. Whether the trial court erred: (1) in determining that foreclosure, rather than forfeiture, was Gamble's remedy for McQueary's nonpayment, and (2) in calculating the amount McQueary owed Gamble.

## Facts and Procedural History

In 2009, Tina McQueary ("McQueary") met Ira J. Gamble ("Gamble") while she was looking to buy a house. She is a longtime retail and factory worker, and he worked for the City of Elkhart, Indiana before retiring. Gamble showed McQueary a house he owned at 315 Beardsley (the "real estate") in Elkhart. The house is over one hundred years old and 1,676 square feet in size.

McQueary was reluctant to purchase the house because it appeared to be in bad shape, but Gamble said she could "fix it up any way [she] want[ed.]" Tr. Vol. II, p. 93.

[4] On April 27, 2009, Gamble and McQueary entered into a contract for the real estate entitled "Lease with Purchase Option" (the "Agreement"). Tr. Vol. III, p. 7. The Agreement consisted of a pre-printed, off-the-shelf form on which Gamble had filled in only some of the blanks. As will become apparent, this document was poorly suited to the parties' needs.

[5] The Agreement provided for monthly payments of $600.00 "for rent" and $100.00 "for property taxes," for a total monthly payment of $700.00, *id.* at 11, over a fourteen-year term ending in May 2023. McQueary was not required to provide a security deposit. The Agreement also included an option to purchase the real estate for a purchase price of $85,000, with a down payment of $2,000.00 payable upon exercise of the option.

[6] Also in the Agreement, and notwithstanding the parties' prior discussions about the house's condition, McQueary agreed "that he or she has examined the demised premises, including the grounds and all buildings and improvements, and that they are, at the time of this lease, in good order, repair, and a safe, clean and rentable condition." *Id.* at 8. In exchange, Gamble promised that he would, "at his sole expense, keep and maintain the leased premises and appurtenances in good and sanitary condition and repair during the term of this lease and any renewal thereof." *Id.* at 9. In fact, the Agreement forbade

McQueary from making any alterations to the house "without the prior written consent of [Gamble.]" *Id.* at 8. And, if the Agreement was terminated and possession of the real estate reverted to Gamble, any improvements McQueary made to the property would remain with the real estate.

[7] Next, the Agreement also provided that Gamble "had obtained" insurance on the real estate covering both property damage and liability. *Id.* at 11. McQueary was responsible only for insurance on her personal property.

[8] Finally, the Agreement provided that if Gamble concluded McQueary had breached its terms, including its payment provisions, Gamble was obligated to give her written notice of default and an opportunity to cure the breach. The parties were supposed to specify how many days would be allowed to cure the breach, but they left that space blank.

[9] McQueary exercised the option to purchase when she paid $2,000.00 to Gamble on the same date they signed the Agreement. But she made regular monthly payments at first of only $600, and later of $500, rather than the required $700, without objection from Gamble.

[10] Within a year, McQueary informed Gamble that she was planning to move out because she could not afford to pay him $700 per month and also make needed repairs to the house. She had obtained boxes in anticipation of moving. Gamble orally offered to reduce her payments to $500 per month, including property taxes, and McQueary accepted his offer.

[11] Initially, Gamble would stop at the house to collect the payments in person and gave McQueary receipts. Gamble later obtained a post office box and directed McQueary to mail her payments there. Gamble gave McQueary signed receipts for each payment, some of which showed that $200.00 in principal was applied to the purchase price, and the remainder of each payment was designated for real estate taxes. The parties agreed that on an annual basis, Gamble would compare McQueary's real estate tax payments with the amount Gamble actually paid. If McQueary had overpaid taxes, any overage would be credited against the purchase price.

[12] McQueary submitted ninety-five monthly payments of $500 from July 2010 until June 2018. Tr. Vol. IV, pp. 178-180. Gamble accepted the payments without complaint for almost eight years, but in June 2018 his attorney sent McQueary a letter asserting for the first time that McQueary had "not been meeting the lease requirements" because she had not been paying $700 per month as provided in the Agreement. Tr. Vol. III, p. 83. Gamble's attorney further instructed McQueary to resume paying $700 and work out a resolution for her "back obligations." *Id.* However, the attorney still characterized the parties' agreement as "leasing to purchase" and did not state the purchase option was no longer operative. *Id.*

[13] After receiving the letter, McQueary continued to make, and Gamble continued to accept, monthly payments of $500.00 without any further objection, reservation, or disclaimer on his part. Gamble never performed an annual calculation of real estate taxes owed to determine whether McQueary had

overpaid taxes and was entitled to an additional credit toward the purchase price.

[14] Meanwhile, in the years after Gamble and McQueary negotiated their oral modification to the Agreement, McQueary and one of her sons completed numerous home improvement projects. Among other improvements, they: (1) replaced the walls, cabinets, sink, and refrigerator in the kitchen; (2) replaced the heating and air conditioning system; (3) replaced the water heater, (4) replaced wiring throughout the house; (5) installed a new fence; (6) replaced the front and back doors; (7) installed a new deck; (8) repaired the roof; and (9) put in a new bathtub and two new toilets. McQueary also chipped in with a neighbor to remove a tree that threatened to interfere with the house's power lines. In all, she spent over $30,000 over the span of a decade.

[15] Gamble noticed the new doors, fence, and deck, but he did not complain to McQueary that she had failed to obtain his permission before doing the work. He also did not forbid her from performing any further home renovations. To the contrary, when McQueary notified Gamble the furnace and the water heater were malfunctioning, he told her, "You're a homeowner now, you have to take care of that." Tr. Vol. II, p. 116.

[16] In 2019, McQueary came into a sum of money. She offered to pay the remaining purchase price in full and asked Gamble to calculate a payoff amount. Instead, in September of 2019, Gamble filed a Verified Request for Immediate Possession of Real Property in small claims court. He alleged that

he was entitled to immediate possession of the real estate and that McQueary's possession of the real estate was wrongful because she had "failed to live up to" the Agreement. Tr. Vol. IV, p. 176. The court dismissed the claim, concluding that it implicated issues involving a land contract beyond the jurisdiction of a small claims court.

[17] In March of 2020, almost ten years after the Agreement was executed, Gamble filed this civil action.[1] McQueary continued to make monthly payments, which Gamble accepted until May of 2022, when he closed his post office box without notice. McQueary's payments were then forwarded to the U.S. Postal Service's lost and found department for undeliverable and non-returnable mail in Indianapolis for several months because her payment envelopes did not include a return address. McQueary eventually discovered the box was closed, cancelled her money orders, and recovered the missing payments.

[18] In January 2024, the trial court presided over a bench trial. Gamble repeatedly testified that McQueary was merely "a renter." Tr. Vol. II, p. 48. By contrast, McQueary testified that she and Gamble had orally agreed to modify the Agreement to reduce the installment payments to $500 but otherwise carried out the Agreement's rent-to-own provisions.

---

[1] Gamble did not include his complaint in his Appellant's Appendix, but he has provided a pre-trial brief that he had filed with the trial court. In that document, Gamble argued: (1) McQueary materially breached the lease provisions of the Agreement; (2) any agreement to sell the house is unenforceable under the Statute of Frauds; and (3) even if the Agreement could be considered a contract for the sale of land, any interest McQueary has in the home is subject to forfeiture due to her failure to pay.

[19]     Following a bench trial, the court sua sponte entered special findings under Trial Rule 52(A). Among other findings, the court determined:

> 8. The Court finds the Parties entered into an oral modification of [the Agreement] wherein the Parties agreed that the monthly payment would be reduced from seven hundred and 00/100 dollars ($700.00) to five hundred and 00/100 dollars ($500.00). The Court further finds that the testimony of [Gamble] that there was no oral modification of [the Agreement] is not credible. The Court bases its finding on the testimony of the Parties at trial that from July 2010 through May of 2022 [McQueary] paid five hundred and 00/100 dollars ($500.00) per month to [Gamble]. [Gamble's] Exhibit #4 and [McQueary's] Exhibits A, B, and E largely corroborate this. [Gamble] argued that he accepted the payments as rent, and [McQueary] argued that she made the payments towards [the Agreement] to purchase the real estate. The receipts of payment often reflect a payoff balance or an amount of reduction of principal which shows the Court that [McQueary] was purchasing the real estate from [Gamble]. The Court finds the testimony of [McQueary] to be more credible than that of [Gamble] as to whether or not there was an oral modification of [the Agreement.] At trial, [Gamble] testified that he did not notify [McQueary] that she was in default under [the Agreement] and that he was not accepting her reduced monthly payments as payments to purchase the real estate until he hired [an attorney who] sent a letter to [McQueary] dated June 1, 2018, which was admitted as [Gamble's] Exhibit #7. [McQueary] confirmed in her testimony that [Gamble] never advised her that she was in default and that he was not accepting the reduced monthly payments towards the purchase of the real estate until she received the letter from [the attorney] dated June 1, 2018.
>
> 9. The Court finds that [Gamble] accepted payments from [McQueary] each of which was less than the seven hundred and 00/100 dollar ($700.00) monthly payment required in [the

Agreement] from May of 2009 through May of 2022. Moreover, the Court finds that [Gamble] accepted monthly payments in the amount of five hundred and 00/100 dollars ($500.00) from [McQueary] from July of 2010 through May of 2022. The Court therefore finds that [McQueary] paid to [Gamble], and [Gamble] accepted from [McQueary,] payments totaling Eighty-one thousand, eight hundred and 00/100 dollars ($81,800.00) toward the purchase of the real estate. All of this shows the Court that the Parties *through their subsequent actions* modified [the Agreement] by their oral agreement.

10. Indiana Code § 32-21-1-1, more commonly known as the Statute of Frauds, requires any contract for the sale of real property to be in writing. Under Indiana Law, an oral contract for the sale of real estate may still be enforced under the Equitable Doctrine of Promissory Estoppel. *Huber v Hamilton*, 33 N.E.3d 1116, 1123 (Ind. Ct. App. 2015). Additionally, Indiana Law recognizes the application of the Doctrine of Promissory Estoppel where the actions of the Parties demonstrate partial performance on the oral promise to sell real property. Where a purchaser of real property pursuant to an oral contract has made payment of the purchase price or a substantial part thereof, is in possession of the real estate, and has made lasting and valuable improvements to the real estate, Indiana Law demands that the Court exercise equity and apply the Doctrine of Promissory Estoppel based on the Parties [sic] partial performance of the oral contract. *Marathon Oil Co. v. Collins.* 744 N.E.2d 474, 478 (Ind. Ct. App. 2001). The Court finds that [McQueary] has made a substantial payment of the purchase price, is in possession of the real estate, and has made lasting and valuable improvements to the real estate. *Accordingly, the Court finds that the Doctrine of Promissory Estoppel under Indiana Law applies to this case and that the Parties [sic] partial performance demands that this Court enforce the oral contract of the parties modifying the [Agreement].*

Appellant's App. Vol. II, pp. 23-25 (emphases added).

The trial court further found:

> 15. In *Skendzel v. Marshall*, 301 N.E.2d 641, 646 (lnd. 1973), the Indiana Supreme Court defined a sale of real estate by land contract to include the following: the seller retains legal title until the total contract price is paid by the purchaser; payments are generally made in periodic installments; legal title does not vest in the purchaser until the contract terms are satisfied, but equitable title vests in the purchaser at the time the contract is consummated; when the Parties enter into the contract, all incidents of ownership accrue to the purchaser; the purchaser assumes the risk of loss and is the recipient of all appreciation in value; the purchaser is responsible for taxes as the equitable owner; and the purchaser has a sufficient interest in land so that upon sale of that interest, the purchaser holds a vendor's lien. The Court finds that under Indiana Law, [the Agreement] is a sale of real estate by land contract because payments were to be made by [McQueary] as purchaser to [Gamble] as seller in monthly installments, that legal title was to be conveyed to purchaser [McQueary] by seller [Gamble] upon payment in full of the purchase price, [McQueary] was to pay the real estate taxes, and [McQueary] assumed pursuant to [the Agreement] "all incidents of ownership" and "all risk of loss." *Accordingly, the Court finds [] McQueary purchased the real estate from [] Gamble on April 27, 2009, with [the Agreement] being a sale of real estate by land contract under Indiana Law.*
>
> 16. *Under Indiana Law, foreclosure rather than forfeiture is the proper remedy [for breach] of a land contract where the purchaser has substantial equity in the real estate at the time of default. Skendzel.* 30l N.E.2d at 650.

*Id.* at 27-28 (emphases added).

The court held that under the Agreement, McQueary owed Gamble the contract purchase price of $85,000.00, plus $15,628.19 for real estate taxes, for a total sum of $100,268.19, that she had paid Gamble $81,800.00, and that she owed a principal balance of $18,468.19. In addition, the court determined that McQueary owed Gamble $10,500.00 for her occupancy of the real estate after she ceased making monthly payments through the date of trial. Thus, the court entered a money judgment for Gamble in the amount of $28,968.19 and held that he was entitled to collect the judgment through a foreclosure against the real estate. This appeal followed.

## Discussion and Decision

### Standard of Review

Indiana Trial Rule 52(A) provides that when the trial court "find[s] the facts specially and state[s] its conclusions thereon," on appellate review we "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

Our Supreme Court has explained that when reviewing sua sponte special findings and conclusions thereon, we apply "a two-tiered standard of review— first determining whether the evidence supports the findings and, if so, whether the findings support the judgment." *Town of Linden v. Birge*, 204 N.E.3d 229, 233 (Ind. 2023). "Without reweighing the evidence or reassessing witness credibility, the appellate court applies a 'clearly erroneous' standard, deferring

to the trial court's factual findings 'as long as they are supported by evidence and any legitimate inferences therefrom.'" *Id.* at 234 (quoting *Ind. Land Tr. Co. v. XL Inv. Props.*, 155 N.E.3d 1177, 1182 (Ind. 2020)).

[24] "We define the clearly erroneous standard based on whether the party is appealing a negative judgment or an adverse judgment." *Todd Heller, Inc. v. Ind. Dep't of Transp.*, 819 N.E.2d 140, 146 (Ind. Ct. App. 2004), *trans. denied*. "Where, as here, the party who had the burden of proof at trial appeals, he appeals from a negative judgment and will prevail only if he establishes that the judgment is contrary to law." *Id.* "A judgment is contrary to law when the evidence is without conflict and all reasonable inferences to be drawn from the evidence lead to only one conclusion, but the trial court reached a different conclusion." *Id.*

[25] When the trial court does not make specific findings on an issue, we apply a general judgment standard, and we may affirm on any legal theory supported by the evidence adduced at trial. *Matter of Estate of Ropp*, 231 N.E.3d 894, 898 (Ind. Ct. App. 2024). And we apply de novo review to the trial court's conclusions of law. *Town of Linden*, 204 N.E.3d at 234.

[26] Gamble argues the evidence does not support the trial court's determination that McQueary has an equitable ownership interest in the real estate. He claims the Agreement alone established the relationship between the parties, that McQueary breached and repudiated the Agreement, which nullified her option to purchase and put an end to their agreement, and that she was at all times

thereafter in default because she never paid the $700.00 monthly payment required under the Agreement.

[27] Thus, Gamble contends that the trial court erred when it entered judgment on an oral modification of the parties' written Agreement and that he was entitled to sue for and recover money damages for breach of the Agreement. The trial court appears to have relied upon two equitable doctrines, promissory estoppel and part performance, in determining the parties' oral agreement was valid and enforceable. Promissory estoppel and part performance are separate doctrines and, if applicable, either exception can support the court's judgment. We will first address the Statute of Frauds, and then promissory estoppel.[2]

## Statute of Frauds

[28] The Statute of Frauds provides that "'any contract which seeks to convey an interest in land is required to be in writing.'" *Brown v. Branch*, 758 N.E.2d 48, 51 (Ind. Ct. App. 2001) (quoting *Guckenberger v. Shank*, 37 N.E.2d 708, 713 (Ind. 1941)); *see also* Ind. Code § 32-21-1-1(b) (2002). The Statute is intended "to preclude fraudulent claims that would likely arise when the word of one person is pitted against the word of another." *Id.*

[29] Even so, the Statute of Frauds does not govern the formation of contracts, but rather only the enforceability of contracts that have been formed. *Dupont*

---

[2] Because we decide the case on the basis of promissory estoppel, we need not address part performance.

*Feedmill Corp. v. Standard Supply Corp.*, 395 N.E.2d 808, 810 (Ind. Ct. App. 1979). Oral contracts for the conveyance of land are voidable, not void. *Marathon Oil Co. v. Collins*, 744 N.E.2d 474, 478 (Ind. Ct. App. 2001). There are "equitable doctrines," including promissory estoppel and part performance, under which a party may seek to enforce an oral land contract despite failing to comply with the Statute of Frauds. *Spring Hill Devs., Inc. v. Arthur*, 879 N.E.2d 1095, 1099 (Ind. Ct. App. 2008).

## Promissory Estoppel

[30] "Estoppel is a judicial doctrine sounding in equity." *Brown*, 758 N.E.2d at 51. It is based on the principle that "one who by *deed or conduct* has induced another to act in a particular manner will not be permitted to adopt an inconsistent position, attitude, or course of conduct that causes injury to such other." *Id.* at 52 (emphasis added).

> Coupled with the statute of frauds, the two represent alternative and sometimes competing means to achieve the same ends of avoiding injustice: 'The statute of frauds was designed as the weapon of the written law to prevent fraud, while the doctrine of estoppel is that of the unwritten law to prevent like evil. Each is effective in its appropriate field; both are essential to prevent and redress wrongs, and neither should be allowed to dominate the other.'

*Spring Hill*, 879 N.E.2d at 1100 (quoting *Columbus Trade Exch., Inc. v. AMCA Intern. Corp.*, 763 F. Supp. 946, 952 (S.D. Ohio 1991)). The purpose of the doctrine of equitable estoppel is to preserve rights previously acquired and not

to create new ones. *First Nat'l Bank of Logansport v. Logan Mfg. Co., Inc.*, 577 N.E.2d 949, 954 (Ind. 1991).

[31] The elements of this species of estoppel are: "(1) a promise by the promissor; (2) made with the expectation that the promisee will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only by enforcement of the promise." *Brown*, 758 N.E.2d at 52.

[32] Regarding the first element, whether Gamble made a promise, McQueary testified that in July of 2010, the parties agreed to an oral modification of the written Agreement, while Gamble testified at trial that there was no such modification and that he never agreed to an oral modification. The trial court, considering the parties' testimony and other evidence submitted at trial, found that the parties entered into an oral modification of the Agreement in which the parties stated that McQueary's monthly payments would be reduced from $700.00 to $500.00. The court also found that Gamble's testimony denying there was an oral modification "is not credible." Appellant's App. Vol. 2, p. 23. There was abundant evidence before the trial court to support this finding and the first element.

[33] The trial court further found that "the Parties through their subsequent actions modified [the Agreement] by their oral agreement." *Id.* at 24-25. The intent relevant in contract matters is not the parties' subjective intent but their outward manifestation of their intent. *Gerdon Auto Sales, Inc. v. Jones Chrysler Dodge Jeep*

*Ram*, 98 N.E.3d 73, 80 (Ind. Ct. App. 2018), *trans. denied*. "In order to determine a party's intent, a court does not examine the hidden intentions secreted in the heart of a person but should examine the final expression of that intent found in conduct." *Id.* The trial court correctly determined that the "subsequent actions" of the parties manifested their intent.

[34] Here, after the parties agreed to modify the Agreement, their actions demonstrated an intent to fulfill the Agreement as modified. McQueary paid Gamble ninety-five monthly payments of $500 per month. In turn, Gamble accepted the payments without complaint or objection, providing her with receipts, some of which showed a portion of the payments were applied to the purchase price, and the remainder to property taxes. In June 2018, as we have noted, Gamble's attorney sent McQueary a letter stating that he had, and still, expected her to pay $700 per month. But he continued to accept $500 monthly payments from McQueary for over a year, without further complaint, until he filed the small claims action. And, even after Gamble filed suit, he continued to accept the payments until 2022, when he closed the mailbox and failed to provide an alternative method for McQueary to pay him. There is ample evidence to support the trial court's finding that the parties orally agreed to modify the Agreement, and we will not re-weigh the evidence or judge the credibility of witnesses.

[35] Gamble asserts that his receipts "informed McQueary that he was not going along with her oral modification." Appellant's Br. p. 20. Quite to the contrary, his receipts ratified the oral modification because many receipts either stated a

balance due or gave McQueary a credit against the principal balance on the purchase price. In so doing, the terms of the original Agreement were modified by the parties' course of conduct, and the conduct of the parties supports the trial court's determination. Further, the Agreement required that Gamble give McQueary "written notice of any default or breach," Tr. Vol. III, p. 10, but it was not until Gamble's attorney sent McQueary a letter, dated June 1, 2018, that Gamble informed McQueary that, in his opinion, she was in default under their agreement. This notice was given only after McQueary had made $500 monthly payments for almost eight years, which Gamble had accepted without any objection or reservation.

[36]  We next consider the second element, the expectation of reliance. The question is whether Gamble made an oral promise to accept monthly payments of $500.00 per month with the expectation that McQueary would reasonably rely upon that promise. We do not consider whether Gamble subjectively expected McQueary to rely on their oral modification but, instead, whether Gamble should have (1) reasonably expected that McQueary would act upon his promise and (2) whether his promise actually induced her to make monthly payments of $500.00 instead of $700.00, including real estate taxes, and to make substantial improvements to the real estate. *See AgReliant Genetics, LLC v. Gary Hamstra Farms, Inc.*, 213 N.E.3d 1087, 1095-96 (Ind. Ct. App. 2023) (discussing expectation of reliance element). The evidence establishes both that Gamble expected for McQueary to act on his promise and observed and

recorded her acting on his promise month-after-month for almost eight years. The second element is well satisfied.

[37] In an attempt to justify his many years of silence, acceptance, and forbearance while McQueary made uninterrupted monthly payments, Gamble contends that he was not obliged to give prior notice of his decision to declare a default and file suit. This contention must fail in that the Agreement, which Gamble asserts is the "sole document establishing the legal relationship between the parties," Appellant's Br. p. 27, requires "written notice of any default or breach" and allows "a reasonable time" for the Lessee to take action "reasonably likely" to cure the alleged default or breach. Tr. Vol. III, p. 10.

[38] The third element is simply whether under the circumstances McQueary's reliance on Gamble's promise was reasonable. Merely to ask that question is to answer it. McQueary never made a $700.00 payment and only made smaller payments each month beginning with $600 in June 2009, and then $500 in July 2010. *See* Exhibit 18, Tr. Vol. IV, pp. 178-180. Gamble accepted and recorded each payment on a receipt and his personal account ledger. Each payment ratified the oral agreement, and Gamble did not object until June 1, 2018. The only permissible inference from this course of conduct is that McQueary's reliance on Gamble's promise was reasonable. Considering only the evidence and reasonable inferences favoring the trial court's judgment, the trial court did not clearly err by concluding that Gamble made a promise upon which McQueary reasonably relied.

[39] Gamble describes the reduced $500.00 payments as "McQueary's alleged oral modification," Appellant's Br. p. 15, as if the modification were her unilateral act, and ignores his own course of conduct. Gamble accepted McQueary's payments without any qualification or reservation and, as we have already noted, continued to issue receipts, most of which showed either a payoff balance or reduction in principal against the purchase price. Indeed, as of September 2019, Gamble's own accounting statement showed a contract balance of $51,000, which was $34,000 less than the original $85,000 purchase price. After accounting for all payments, the trial court concluded that McQueary had paid, and Gamble had accepted, $81,800 in payments toward the purchase price of the real estate.

[40] Even if Gamble considered McQueary to be a mere renter, he did not inform McQueary that it was his position but instead allowed her to pay thousands of dollars to build equity in the property. And she made substantial improvements to the property with Gamble's knowledge, again without Gamble having informed her that insofar as he was concerned she was only renting. Gamble testified and the trial court found that he "never advised her that she was in default and that he was not accepting her reduced monthly payments toward the purchase of the real estate until she received the letter [from Gamble's attorney] dated June 1, 2018." Appellant's App. Vol. 2, p. 24. In addition, the June 1 letter acknowledged McQueary was "leasing to purchase" the real estate, and did not inform her that Gamble had determined the purchase option of their agreement was no longer operative. Tr. Vol. III, p. 83.

[41] The fourth element, the definite and substantial nature element of promissory estoppel, requires a showing of independent consideration given in reliance on the oral promise, that is, consideration substantially greater than performance of the agreement itself. The trial court found that McQueary's monthly payments included the payment of real estate taxes totaling $15,628.19. McQueary would not have been obliged to pay these taxes if she were only renting rather than purchasing the house. The trial court calculated the amount of the payments attributed to the purchase price and calculated the real estate taxes owed and paid, and even taking into account payments made before the oral modification, or payments made after Gamble closed his post office box and (without McQueary's knowledge) rendered her delivery of payments impossible, there is no question but that McQueary paid a substantial amount of the original $85,000 purchase price, which included real estate taxes, after the oral modification.

[42] Gamble disputes that McQueary's monthly payments to him amounted to independent consideration. He contends that McQueary merely made payments that she would have made for rent to occupy the residence as a tenant, in other words, that she suffered no harm or damages at all, and there is insufficient evidence to prove the substantial and independent consideration required to remove an oral agreement from the Statute of Frauds.

[43] Gamble's point might be well taken if the rental value of the real estate were the only factor to be considered, but that does not end our inquiry. We must also consider the conduct of the parties. As shown by the receipts, the parties

attributed a part of each monthly payment for real estate taxes, which McQueary would not have paid as a lessee. In addition, after the parties negotiated the oral modification of the Agreement, McQueary made extensive improvements to the real estate in reliance upon her oral agreement with Gamble. The evidence shows, and the trial court found, that McQueary made repairs and improvements on the real estate totaling $30,581.00, which she itemized with receipts, contracts, and photographs supporting her testimony. Gamble was aware of at least some of these improvements, but he did not object to any of them. And the trial court concluded that McQueary made "lasting, valuable, and substantial improvements to the real estate[]" that she would not have made if she were not exercising her option to purchase the real estate. Appellant's App. Vol. 2, p. 27.

[44] Finally, the fifth and ultimate element and question is whether McQueary would suffer an injustice from her reliance on the oral modification of the Agreement if the promissory estoppel exception to the Statute of Frauds were not applied. To establish that injustice can be avoided only through enforcement against a promisor, the promisee must show that the reliance injury is "(1) independent from the benefit of the bargain and the resulting incidental expenses and inconvenience; [and] (2) so substantial as to constitute an unjust and unconscionable injury." *Coca-Cola Co. v. Babyback's Intern., Inc.*, 841 N.E.2d 557, 569 (Ind. 2006), *disapproved of in part on other grounds by Pennington v. Mem. Hosp. of South Bend, Inc.*, 223 N.E.3d 1086, 1094 n.1 (Ind. 2024).

[45] The evidence shows, and the trial court found, that McQueary made repairs and substantial improvements on the real estate totaling $30,581.00. And the trial court found that McQueary had paid the real estate taxes on the real estate in the amount of $15,628.19. McQueary would neither have paid the taxes owed after the oral modification nor made the repairs and improvements but for her reasonable reliance on Gamble's acceptance of her continuous and monthly payments from July 2010 until June 2018, when his attorney sent her the letter discussed above. But, he continued to accept McQueary's payments for several years after sending the letter. Each payment ratified their oral agreement and was consistent with a reasonable, good faith belief that McQueary was a purchaser and not a renter.

[46] Further, McQueary's reliance was not a one-off nor was it incidental or collateral to the transaction. We agree with the Seventh Circuit, while sitting in diversity and applying Indiana substantive law in *Classic Cheesecake Company, Inc. v. JPMorgan Chase Bank*, 546 F.3d 839, 845 (7th Cir. 2008), that, "[t]he more protracted the period during which reliance costs are being incurred, the stronger the inference that the oral promise was as [a party] represents it to be[.]" Here, McQueary's reliance costs accumulated over a long period of time, which underscores both the significance and reasonableness of her reliance. Not to enforce the oral bargain would result in an unjust and unconscionable injury to McQueary, because she would be left without compensation for her tax payments and her extensive improvements to the house, which would remain with the property.

[47] As we have noted, Gamble contends that his acceptance of $500 monthly payments over a period of fourteen years "did not cause McQueary a substantial or independent injury" in that "she was already obligated under the Lease to pay $100.00 more, or $600.00, for the rent alone." Appellant's Br. p. 14. Gamble ignores his own conduct and misdirection in accepting the reduced $500 payments, while attributing $200.00 of each payment to principal, with each payment confirming that the original Agreement had been modified, while he kept to himself and did not tell McQueary of his contention that McQueary was "renting, not buying." Tr. Vol. II, p. 64.

[48] In sum, under the equitable doctrine of promissory estoppel, the trial court did not err in determining that the parties' oral agreement was enforceable despite not complying with the Statute of Frauds.

## Forfeiture v. Foreclosure and Calculation of Judgment

[49] Even if the trial court properly determined that McQueary had an equitable ownership interest in the real estate, Gamble claims the court erred in holding that foreclosure, rather than forfeiture, was the appropriate remedy for McQueary's failure to pay the full amount of the purchase price, plus unpaid rent. Specifically, he argues, "McQueary likely does not have substantial equity in the [real estate] in which case Gamble would be entitled to forfeiture instead of a money judgment." Appellant's Br. p. 27.

[50] Gamble cites to *Skendzel v. Marshall*, 301 N.E.2d 641 (Ind. 1974) to support his claim. In that case, the heirs in interest to a seller of a piece of real estate filed a

complaint against the purchasers, arguing the purchasers had forfeited any rights to the land under the parties' land sale contract by failing to make timely payments. The purchasers prevailed in the trial court, but the Indiana Supreme Court reversed. The Court first noted, "Forfeitures are generally disfavored by the law." *Id.* at 644. If the purchasers were deemed to have forfeited their rights under the contract, they would have lost possession of the real estate plus $21,000 in previous payments, which amounted to over one-half of the agreed-upon purchase price. Noting that under conditional land contracts, "equitable title [to the real estate] vests in the vendee at the time the contract is consummated[,]" *id.* at 646, the Court concluded, "a conditional land sales contract [is] in the nature of a secured transaction, the provisions of which are subject to all proper and just remedies at law and in equity," *id.* at 650. Applying that principle to the facts of the case, the Court determined a judgment of foreclosure, rather than forfeiture, was required because the purchasers had paid more than half of the purchase price and forfeiting that money would have been unconscionable.

[51] In this case, the holding in *Skendzel* supports the trial court's decision. The court found, with ample evidentiary support in the record, that: (1) the parties had agreed to reduce McQueary's payments to $500 per month; (2) McQueary did not default on her payment obligations until June 2022, when Gamble stopped allowing her to mail payments to him; (3) McQueary had paid over three-fourths of the purchase price; and (4) McQueary had paid over $30,000 for improvements to the property in anticipation that she would own it free and

clear. Under these circumstances, as in *Skendzel*, forfeiture would be unconscionable.

[52] Next, Gamble takes issue with the trial court's calculation of the amount McQueary owes him. He claims, "Gamble was entitled to every payment shortfall over the 14 year [sic] period of the [Agreement.]" Appellant's Br. p. 27. The premise for Gamble's argument is that McQueary was still obligated to pay $700 per month under the Agreement. As we have discussed above, the trial court did not err in concluding the parties orally agreed to reduce McQueary's payments to $500 per month. We need not address this claim further.

[53] Finally, Gamble argues the trial court should have ordered McQueary to pay him prejudgment interest "on every shortfall." *Id.* In support of his claim, he cites only to Indiana Code section 24-4.6-1-102 (1974). That statute sets the rate at which interest is calculated when parties to a transaction do not otherwise agree, but it does not explain the circumstances under which a litigant is entitled to prejudgment interest. We will not make Gamble's arguments for him, and we conclude he has waived this issue. *See Nehi Beverage Co., Inc. of Indianapolis v. Petri*, 537 N.E.2d 78, 84 (Ind. Ct. App. 1989) (party's claim regarding prejudgment interest waived for failure to present cogent argument; party merely cited to statutes and listed cases), *trans. denied*.

# Conclusion

For the reasons stated above, we conclude that Gamble has not shown that the trial court's judgment is clearly erroneous and contrary to law, and we affirm the judgment of the trial court.

Affirmed.

Weissmann, J., and DeBoer, J., concur.

ATTORNEYS FOR APPELLANT

James R. Byron
Alex B. Bowling
Thorne Grodnik, LLP
Elkhart, Indiana


ATTORNEYS FOR APPELLEE

David Pruitt
Notre Dame Clinical Law Center

Jacob Orme
Bennett Rogers
Certified Legal Interns
South Bend, Indiana